IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SALT LAKE CITY CORPORATION;<br><br>Plaintiff;<br><br>v.<br><br>SOUTHWEST PIPELINE AND TRENCHLESS CORP.; SAFECO INSURANCE COMPANY OF AMERICA, INC.; and DOES 1–10;<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND FINDING MOTION TO STRIKE TO BE MOOT**<br><br>Case No. 2:17-cv-01095-JNP-CMR<br><br>District Judge Jill N. Parrish |

Salt Lake City Corporation hired Southwest Pipeline and Trenchless Corporation (Southwest) to rehabilitate a sewer line. Southwest used components supplied by Sekisui Rib Loc Australia Pty Ltd. (Sekisui Australia) and Sekisui SPR Americas, LLC (Sekisui Americas) to complete the project. Salt Lake City sued Southwest, alleging that the rehabilitated sewer line was leaking. Southwest filed a crossclaim for breach of contract against Sekisui Australia and Sekisui Americas (collectively, Sekisui).

Before the court are Sekisui's motion for summary judgment on Southwest's breach of contract crossclaim, ECF No. 180, and Southwest's motion to strike an affidavit proffered by Sekisui, ECF No. 186. The court GRANTS Sekisui's motion for summary judgment. The court finds Southwest's motion to strike to be MOOT because the affidavit does not affect the outcome of the motion for summary judgment.

## BACKGROUND

Southwest repairs and rehabilitates underground pipes. Sekisui sells equipment and material used to install a liner within existing underground pipes. This "trenchless" method of pipe

rehabilitation avoids the need to dig up and replace the pipe. Southwest entered into a contract (Contract) with Sekisui to purchase goods and acquire licenses necessary to use Sekisui's pipe rehabilitation system. The contract consisted of two main documents: the Customer Specific Terms and Conditions (Customer Specific Terms or CSTC) and the General Terms and Conditions for Sale and Delivery (General Terms or GTCSD).[1]

The preamble to the Customer Specific Terms stated that the "Buyer [Southwest] wishes to purchase products and to receive know how from the Seller [Sekisui] and the Seller agrees to provide to the Buyer products and to license know how and technology to the Buyer." The Contract required Southwest to purchase at least one complete set of equipment used to install the rehabilitation system (installation equipment). CSTC § 5.2. The Contract also contained numerous provisions establishing the terms and conditions for future purchases of "thermo-plastic profile strip"—the material used to line the interior of underground pipes (liner material). *See* GTCSD § 1.

The Contract granted Southwest a free, non-exclusive license to use Sekisui's "technology" to rehabilitate underground pipes. CSTC § 4; GTCSD § 3. Southwest also had a "preferred status" within its assigned territory of California, Oregon, Nevada, and Washington, meaning that Sekisui could issue only one other license to use its rehabilitation system within this territory. CSTC § 7.1.

---

[1] The Customer Specific Terms states that the Contract consists of five documents: (1) the Customer Specific Terms and Conditions, (2) the General Terms and Conditions for Sales and Delivery, (3) the Global Price List for Rehabilitation Materials, (4) the Charge List for Training and Technical Support, and (5) the Purchase Contract Proposal for the installation equipment. The Sekisui defendants represent that they were unable to find copies of the Global Price List for Rehabilitation Materials, the Charge List for Training and Technical Support, or the Purchase Contract Proposal, if these documents ever existed.

Southwest could use the licensed technology outside of its assigned territory only if it obtained written authorization from Sekisui. CSTC § 7.3; GTCSD § 4.4.

The Contract required Southwest to meet minimum purchase objectives each calendar year. CSTC § 8.1. If Southwest failed to purchase the minimum dollar amount of installation equipment and liner material within a particular year, it would lose its preferred status within its assigned territory and the purchase objective amount would be reduced by 50%. CSTC § 8.2. If Southwest failed to meet this reduced purchase objective in any subsequent year, Sekisui had the option to terminate the contract. CSTC § 8.3.

The Contract required Southwest's employees to complete a two-week training program in order to become proficient in using the Sekisui technology. CSTC § 9; GTCSD § 3.7. Sekisui was required to provide the two-week initial training program free of charge at Southwest's place of business. CSTC § 9.1. Southwest could also purchase additional training or onsite project support services from Sekisui. CSTC § 9.2.

After Southwest and Sekisui entered into the Contract, Southwest submitted a bid to rehabilitate a sewer line in Salt Lake City using Sekisui's liner system. Southwest won the bid. On December 31, 2009, Southwest submitted a purchase order to Sekisui for liner material to be used in the Salt Lake City project. The material cost was $180,137.48. The purchase order also added Salt Lake City sales tax in the amount of $12,339.42, for a total of $192,476.90. On January 21, 2010, Southwest submitted a second purchase order for $321,239.84 in liner materials for the Salt

Lake City project. The Salt Lake City sales tax on this amount was $22,004.93, for a total of $343,244.77. The combined total of the two purchase orders was $535,721.67.[2]

In late 2012, Southwest finished the sewer line rehabilitation project. On December 17, 2012, Salt Lake City notified Southwest that it had discovered "a significant defect and leak in the liner." Over the next two and a half years, Southwest and the city formulated a number of plans to fix the leak and Southwest made one unsuccessful attempt to repair the sewer line. On June 22, 2015, Southwest declined to make any further plans to repair the sewer line.

On May 10, 2017, Salt Lake City sued Sekisui. On November 8, 2017, the city amended its complaint to add claims against Southwest. Meanwhile, Southwest sued Sekisui on October 2, 2017. That lawsuit was consolidated with crossclaims that Southwest had asserted in this lawsuit.

The court previously dismissed all of Southwest's crossclaims except for its claim that Sekisui breached two provisions of the Contract: (1) section 9.2 of the Customer Specific Terms, which permitted Southwest to request additional installation training from Sekisui and (2) section 13.1 of the General Terms, which warranted that the liner material would be free from defects. Sekisui now moves for summary judgment on Southwest's breach of contract crossclaim, arguing that it is barred by the four-year statute of limitations for a contract for the sale of goods. In support of its motion, Sekisui submitted an affidavit prepared by its COO, Shintaro Shibata. Southwest moved to strike the Shibata affidavit, asserting that it did not contain admissible evidence and should be excluded because Sekisui did not designate Shibata as a witness in this case.

---

[2] Sekisui initially argued that a third purchase order for project support services related to the Contract. But Southwest cited evidence that this purchase order was associated with a different product and was, therefore, not governed by the Contract. On summary judgment, the court resolves this factual dispute in favor of Southwest as the nonmoving party and does not consider the services purchase order.

4

ANALYSIS

I.   SEKISUI'S MOTION FOR SUMMARY JUDGMENT

   A.  *Legal Standard*

   Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

   Summary judgment on a statute of limitations affirmative defense is proper if there are no genuine disputes of material fact that would preclude the resolution of the statute of limitations issue. *See City of Wichita, Kan. v. U.S. Gypsum Co.*, 72 F.3d 1491, 1498 (10th Cir. 1996).

   B.  *Predominant Purpose Test*

   Southwest received notice of the defects in the liner it installed in the sewer line on December 17, 2012. The court has previously ruled that there is no dispute that the statute of limitations began to run on Southwest's breach of contract claims against suppliers of parts for the sewer rehabilitation project soon after it was notified of the leaks because it had a duty to investigate any claims arising from the defects. ECF No. 173, pp. 6–7; ECF No. 136, p. 25. Southwest does not dispute that its breach of contract claim accrued in December 2012.

   But the parties disagree as to whether the court may determine which statute of limitations applies to Southwest's breach of contract claim at the summary judgement stage of the litigation. Sekisui argues that the undisputed facts show that the four-year statute of limitations for breach of

a contract for the sale of goods should govern. *See* UTAH CODE § 70A-2-725(1). Southwest asserts that disputes of fact prevent the court from determining whether the Contract was for the sale of goods governed by the four-year limitations period found in the Utah Uniform Commercial Code (UCC), or whether the six-year statute of limitations for a written contract should be applied to its breach of contract claim. *See id.* § 78B-2-309(1)(b).

The UCC establishes a four-year statute of limitations for "[a]n action for breach of any contract for sale." *Id.* § 70A-2-725(1). "In [the UCC] unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present or future sale of goods. 'Contract for sale' includes both a present sale of goods and a contract to sell goods at a future time." *Id.* § 70A-2-106(1). The term "goods" is defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." *Id.* § 70A-2-105(1). The installation equipment and the liner material at issue in this case are goods because they were movable at the time that they were identified in the Contract.

Thus, the Contract is at least partially a "contract for sale" as defined by the UCC because it relates to Sekisui's sale of goods to Southwest. But the Contract also contains terms that are unrelated to the sale of goods. For example, the Contract defines the parties' obligations regarding training services provided by Sekisui. The Contract also contains clauses granting Southwest a license to use Sekisui's technology within a defined territory. Southwest argues that the licensing portions of the Contract do not relate to the sale of goods. Thus, the Contract is a mixed contract for both goods and non-goods.

Utah employs the predominant purpose test to determine whether a mixed contract is controlled by the UCC. *Utah Loc. Gov't Tr. v. Wheeler Mach. Co.*, 199 P.3d 949, 956 (Utah 2008). Under this test, the court reviews "the factual circumstances surrounding the negotiation,

formation and contemplated performance of the contract to determine whether the contact is predominantly or primarily a contract for the sale of goods." *Id.* Courts also look to the language of the contract to determine its primary purpose. *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998) ("Our starting point is the language of the Contract itself, which provides a number of indicia that the parties intended a contract for goods rather than services."); *Insul-Mark Midwest, Inc. v. Mod. Materials, Inc.*, 612 N.E.2d 550, 555 (Ind. 1993) ("To determine whether the predominant thrust of a mixed contract is to provide services or goods, one first looks to the language of the contract in light of the situation of the parties and the surrounding circumstances." (citation omitted)); 67 AM. JUR. 2D *Sales* § 32 (2021) ("In undertaking [a predominant purpose] analysis, a court first looks to the language of the contract."). Additionally, courts consider the cost of the goods and non-goods[3] portions of the contract. *De Filippo v. Ford Motor Co.*, 516 F.2d 1313, 1323 (3d Cir. 1975) ("If, viewed as a whole, it can be concluded that the essential bulk of the assets to be transferred qualify as 'goods', then it is appropriate to consider the transaction a 'contract for the sale of goods'."); *Insul-Mark Midwest*, 612 N.E.2d at 555 (courts examine "the costs involved for the goods and services, and whether the purchaser was charged only for a good, or a price based on both goods and services"); *St. Anne-Nackawic Pulp Co. v. Research.-Cottrell, Inc.*, 788 F. Supp. 729, 734 (S.D.N.Y. 1992) (analyzing the total purchase price attributable to goods and non-goods to determine a contract's principal purpose). If a court

---

[3] Most of the cases employing the predominant purpose test compare the goods provisions of a contract to the services provisions of the contract. But "services represent just one example of a non-good." *Vermillion State Bank v. Tennis Sanitation, LLC*, 947 N.W.2d 456, 467 (Minn. Ct. App. 2020), *review granted* (Sept. 15, 2020). Because Southwest argues that some provisions of the Contract at issue in this case are not related to either goods or services, the court uses the term "non-goods" throughout this order.

determines that the predominant purpose of a contract is the present or future sale of goods, the UCC—including the four-year statute of limitations—governs the entire contract. *Salt Lake City Corp. v. Sekisui SPR Americas, LLC*, 482 F. Supp. 3d 1177, 1188 (D. Utah 2020).

### C. Predominant Purpose Analysis

To determine the predominant purpose of the Contract, the court first looks to the language of the agreement. The terminology used in the Contract indicates that it is primarily a contract related to the sale of goods. The title of the General Terms and Conditions for Sale and Delivery emphasizes that the thrust of the Contract is to establish the terms and conditions for the sale and delivery of the installation equipment and the liner material, both of which are goods. The Customer Specific Terms and the General Terms repeatedly refer to Sekisui as the "Seller" and to Southwest as the "Buyer." These terms connote a contract for the sale of goods. *See BMC*, 160 F.3d at 1331 (holding that a contract's title—"PURCHASE ORDER"—and the use of the terms "Buyer" and "Seller" to refer to the parties of the contract indicated "that the parties had a contract for goods in mind"); *Fab-Tech, Inc. v. E.I. DuPont De Nemours & Co.*, 311 F. App'x 443, 445 (2d Cir. 2009) (holding that the use of the terms "Buyer" and "Seller" to refer to the parties of a contract signaled that the contract was for the sale of goods rather than services).

The terms of the Contract are also centered on the sale of goods. The Contract required Southwest to immediately purchase at least one set of installation equipment from Sekisui. CSTC § 5.2. Southwest was also required to meet minimum annual purchase objectives for installation equipment and liner materials sold by Sekisui. CSTC § 8.1. The Contract set the terms and conditions for the sale of these goods to Southwest, including prices; CSTC § 2.1, GTCSD § 5; the payment of sales taxes; GTCSD § 5.3; the terms of payment; CSTC § 2.4, GTCSD § 6; the delivery time for the goods; GTCSD § 7; packing, transportation, and insurance for the goods;

GTCSD §§ 8, 9; Southwest's duty to inspect the goods upon delivery; GTCSD § 10; and warranties that the goods would be free from defects; GTCSD §§ 12, 13. In short, the Contract set all of the terms and conditions for present and future purchases of goods from Sekisui and set minimum amounts that had to purchased each year. All subsequent purchase orders for specific items incorporated these terms and conditions. GTCSD § 2.2.

Although the Contract contains provisions related to training and project management services provided by Sekisui, the terms of the Contract related to the sale of goods clearly predominate. In order to ensure that Southwest's employees had sufficient knowledge and skill to properly install Sekisui's pipe rehabilitation system, the Contract required the employees to complete a two-week training program provided by Sekisui. CSTC § 9.1; GTCSD § 3.7. Sekisui was required to provide the training program free of charge at Southwest's place of business. CSTC § 9.1. Southwest could also pay for additional training or onsite project support services. CSTC § 9.2. Viewing the Contract as a whole, these provisions are ancillary to the main focus of the contract—Sekisui's sale of goods to Southwest in order to complete underground pipe rehabilitation projects. One of the key provisions of the Contract required Southwest to make minimum purchases of goods each year. CSTC § 8.1. The initial training program, on the other hand, was provided free of charge. Although, Southwest had the option to purchase additional training and project management services from Sekisui, there is no evidence that it did so. Comparing the relative costs associated with the services provisions of the contract ($0) with the cost of the goods purchased just for the Salt Lake City sewer rehabilitation project ($535,721.67), it is clear that that the goods portion of the contract predominates.

The Contract also contains provisions granting Southwest a license to use Sekisui's "Technology," which the agreement defines as "certain patents, trademarks, and other intellectual

9

property rights and know how in respect of the [liner material] and the [installation equipment]." GTCSD § 1. The Contract granted Southwest "a non-exclusive license to make, use, and sell products utilizing the Technology within the geographical area specified in the Customer Specific Terms and Conditions." GTCSD § 3.1. The Contract stated that no "fee or royalty shall be payable by the Buyer [Southwest] in respect of the license." GTCSD § 3.3. Sekisui also agreed that Southwest would have a "preferred status" within the defined territory, meaning that Sekisui could grant only one additional technology license within the region. CSTC § 7.1. In other words, the Contract created a semi-exclusive sales relationship between Sekisui and Southwest. Upon termination of the Contract, Southwest would lose the right to "use the Technology, Products, Know-how and Trademarks." GTCSD § 20.6.

Southwest argues that the technology license was a non-good and that the Contract's primary purpose was to convey the license. Southwest further contends that its preferred status within its assigned territory was a non-good that conferred a significant competitive advantage by limiting the number of contractors that could bid for projects using the Sekisui technology. Southwest asserts that due to the technology license and preferred status provisions, the primary purpose of the contract was for non-goods. The court disagrees for three reasons.

First, both Utah courts and courts from other jurisdictions have held that contracts defining a continuing sales relationship are governed by the UCC. The Contract at issue here is akin to a distributorship agreement. Southwest agreed to purchase liner material from Sekisui, which Southwest would then install in a customer's underground pipe. Southwest would charge the customer for the cost of the liner material and its installation services. The Utah Supreme Court has held that "[a]lthough a distributorship agreement is more involved than a typical sales contract, it is subject to Utah's Uniform Commercial Code." *Quality Performance Lines v. Yoho Auto., Inc.*,

609 P.2d 1340, 1342 (Utah 1980). The Tenth Circuit has also noted that "an overwhelming majority of . . . jurisdictions have held that distributorship contracts are sales contracts and thus governed by the UCC." *Pepsi-Cola Bottling Co. of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005); *accord Paulson, Inc. v. Bromar, Inc.*, 775 F. Supp. 1329, 1333 (D. Haw. 1991) (noting that sixteen states, including Utah, have held that distributorship contracts are governed by the UCC). Even distributorship contracts that contain an exclusivity clause are predominantly for the sale of goods and are governed by the UCC. *Sally Beauty Co. v. Nexxus Prod. Co.*, 801 F.2d 1001, 1005 (7th Cir. 1986) (collecting numerous cases holding that both exclusive and non-exclusive distributorship contracts are goods contracts controlled by the UCC).

The reasoning of these cases applies to the Contract between Sekisui and Southwest. The Contract is more complicated than a typical contract concerning a single transaction because, like a distributorship agreement, it governs an ongoing sales relationship. But the core of the Contract concerns the sale of goods from Sekisui to Southwest. Additionally, similar to an exclusive distributorship contract, provisions granting Southwest a semi-exclusive license to use Sekisui's products within a defined territory do not alter the essential goods-centric nature of the Contract.

Second, the court disagrees with Southwest's contention that the technology license and preferred status provisions of the Contract are non-goods provisions. The technology license was

> strictly limited to the application in the field of Pipe Rehabilitation/Renovation, whereby "Rehabilitation/Renovation" shall be understood as the in situ (in the pipe) manufacture of all kinds of shape [sic] of tubular objects, for the renovation, repair, lining, re-lining, renewal or rehabilitation of culverts, ducts, pipelines, conduits, tunnels, bores and like structures, including the provision of any service in connection with these activities

CSTC § 4.1. In other words, the technology license principally gave Southwest permission to use, within a specific geographic area, the installation equipment and liner material for their intended

purpose: to rehabilitate underground pipes by installing the liner material inside the existing pipe.[4] The license to use these goods is inseparably intertwined with the physical goods themselves. The licensing provisions simply convey, with some limitations, the right any purchaser of goods normally receives—the right to use the good. Because the license is integral to the goods Southwest purchased from Sekisui, the portion of the Contract conveying this license is not severable from the goods provisions of the agreement. *See Colonial Life Ins. Co. of Am. v. Elec. Data Sys. Corp.*, 817 F. Supp. 235, 239 (D.N.H. 1993) (finding that where the main object of a contract was to provide a license to use a computer software product, which was a good, the predominant purpose of the contract was the sale of goods); c*f. Wheeler*, 199 P.3d at 956 (where "hardware and software elements are combined into a single unit—the computer system—prior to sale[,] . . . the computer system is predominantly 'goods'" (alterations in original) (quoting *Neilson Bus. Equip. Ctr., Inc. v. Italo V. Monteleone, M.D., P.A.*, 524 A.2d 1172, 1174 (Del. 1987))). Thus, the technology licensing provisions are goods provisions because they are closely related to the sale of equipment and liner material to Southwest.[5]

---

[4] Some of the technology license provisions, on the other hand, permitted Southwest to use the know how conveyed through the mandatory training program. *See* GTCSD §§ 1, 20.6. This licensing of know how is aligned with the services aspect of the Contract and, therefore, is a non-good. But for the same reasons that the training provisions of the Contract are ancillary to the goods provisions, the license to use Sekisui's know how is not the principal purpose of the contract.

[5] Southwest argues that the licensing provisions predominate over the goods provisions of the Contract because the goods purchased from Sekisui would be worthless without the license to use the goods to rehabilitate underground pipes. But the converse is also true. A license to use the goods would be equally useless without the goods themselves. Thus, Southwest's argument demonstrates the close connection between the technology license and the goods themselves and further bolsters the court's conclusion that the licensing clauses are goods provisions.

The preferred status provision is likewise related to the sale of goods. This clause limited Sekisui's ability to sell goods to other contractors within the designated territory, creating a semi-exclusive sales relationship with Southwest. Because this clause defines the parties' rights regarding the sale of goods, it is a goods provision.

Third, even if the technology license and preferred status provisions could be considered non-goods provisions, these clauses would not predominate over the goods provisions of the Contract. The technology license was provided at no additional charge, GTCSD § 3.3, while the total cost of the goods ordered for the Salt Lake City project alone was $535,721.67. Moreover, although Sekisui had the option to provide the exclusive right to use its goods within a territory in exchange for an "Exclusivity Fee," GTCSD § 4.1, the parties chose to enter into a semi-exclusive sales relationship for free. Thus, the comparative costs associated with the goods provisions and the licensing and preferred status provisions demonstrate that the goods provisions predominate.[6]

### D. *Duchaineau Affidavit*

Southwest argues that the affidavit of its President, Justin Duchaineau, creates a dispute of material fact that prevent the court from determining that the main purpose of the contract was for the sale of goods. In his affidavit, Duchaineau declares: "The predominant purpose of the [Contract] was for Southwest to obtain the right to use the Sekisui Technology and to establish

---

[6] At oral argument, Southwest cited *Newcourt Financial USA, Inc. v. FT Mortgage Companies*, 161 F. Supp. 2d 894 (N.D. Ill. 2001) as the best case supporting its contention that disputes of material fact preclude summary judgment. *Newcourt Financial* is not binding authority. Moreover, it is distinguishable. The contract at issue in that case was for both products and services. *Id.* at 898. But the price schedule provided to that court did not distinguish between products and services. Without undisputed evidence regarding the specific cost of products and services provided under the contract, the *Newcourt Financial* court could not determine whether goods or services predominated. *Id.* Here, however, there is no such ambiguity. The purchase orders provided to the court are unambiguously for goods alone.

Southwest as a licensed distributor authorized to use the Sekisui Technology . . . ." He further asserts:

> Southwest understood and intended that payment for the right to use the Technology was through payment for the quantities of liner material used in the application of the Technology on Southwest projects. The [Contract] does not break out any specific amount for payment for the right to use the Technology. Southwest understood and intended that payment of invoices for the material was predominantly for use of the Technology because absent the right to use the Technology, the [liner] material had little or no value to Southwest.

Based upon this affidavit, Southwest asserts that the predominant purpose of the Contract can only be determined by the court or the jury after hearing evidence on this issue.

The court disagrees. In light of Utah caselaw holding that distributorship contracts are governed by the UCC, *Quality Performance Lines*, 609 P.2d at 1342, Southwest cannot create a dispute of material fact through an affidavit asserting a party's understanding as to the predominant purpose of a contract. Moreover, Duchaineau's conclusory assertion that the predominant purpose of the Contract was to obtain a license to use Sekisui's technology is not sufficient to create a legitimate dispute of material fact. To determine the predominant purpose of a contract, one of the factors that courts consider is "the factual circumstances surrounding the negotiation, formation and contemplated performance of the contract." *Wheeler*, 199 P.3d at 956. In other words, evidence of the parties' shared understanding of a contract's principal purpose at the time of its formation is relevant to this determination. *Cf. Nielsen v. Gold's Gym*, 78 P.3d 600, 602 (Utah 2003) ("It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract." (citation omitted)). But the Duchaineau affidavit is devoid of any facts pertaining to the negotiation, formation, or contemplated performance of the contract that could shed light on the parties' mutual understanding of the Contract's predominant purpose when it was

formed. His unsubstantiated conclusion regarding the predominant purpose of the contract does not create a genuine dispute of fact. *Cf. Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1005–06 (Utah 2016) (holding that a party to a contract may not prove a latent ambiguity by submitting a self-serving affidavit setting forth that party's belief as to what the contract means).

Duchaineau's conclusory assertion that Southwest understood that payments for goods supplied by Sekisui were predominantly to compensate Sekisui for the technology license rather than the goods themselves is similarly unavailing. He does not provide any facts regarding the negotiation and formation of the Contract that would evidence the parties' mutual intent regarding the purported licensing fees. And, in fact, Southwest's claimed understanding regarding the nature of the payments for Sekisui's products is belied by the purchase orders generated by Southwest. The purchase orders calculate sales taxes based upon the entire purchase price of the goods ordered, indicating that amount was solely for goods and not partially for licensing fees.

Under applicable caselaw, Duchaineau's self-serving affidavit does not create a genuine dispute of material fact as to the predominant purpose of the contract.

E.  *Conclusion*

Analyzing the terms of the Contract and the relative costs associated with the goods and non-goods provisions, the court concludes that the Contract is principally for the present and future sale of goods. The economic reality underpinning the Contract is that Sekisui made money selling its goods to Southwest, which obtained the goods necessary to complete projects, including the Salt Lake City project. Thus, Southwest's claim for breach of this Contract is governed by the UCC's four-year statute of limitations. Southwest indisputably filed its breach of contract claim after the UCC statute of limitations had run. Accordingly, Sekisui is entitled to summary judgment on Southwest's breach of contract crossclaim.

## II.    SOUTHWEST'S MOTION TO STRIKE

Southwest moved to strike certain statements made in the Shibata affidavit proffered by Sekisui, asserting that the statements were not admissible and that they should be excluded because Sekisui did not designate Shibata as a witness in this case. At oral argument, Southwest clarified that it did not seek to exclude any of the documents attached to the affidavit.

The court did not rely on any of the statements made in the Shibata affidavit in ruling on the motion for summary judgment. Accordingly, the motion to strike the affidavit is moot.

## CONCLUSION AND ORDER

The court orders as follows:

(1) The court GRANTS Sekisui's motion for summary judgment. ECF No. 180. No crossclaims remain against Sekisui.

(2) The court finds Southwest's motion to strike to be MOOT. ECF No. 186.

DATED September 21, 2021.

                             BY THE COURT

                             _____
                             Jill N. Parrish
                             United States District Court Judge