IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SALT LAKE CITY CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST PIPELINE AND TRENCHLESS CORP. and SAFECO INSURANCE COMPANY OF AMERICA, INC.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND FINDING MOTION TO STRIKE TO BE MOOT**<br><br>Case No. 2:17-cv-01095-JNP-CMR<br><br>District Judge Jill N. Parrish |

Southwest Pipeline and Trenchless Corporation entered into a contract with Salt Lake City Corporation to rehabilitate a sewer line. Safeco Insurance Company of America, Inc. issued a performance bond for the project. Salt Lake City later sued Southwest and Safeco, alleging that the rehabilitated sewer line was leaking. The city asserted that Southwest, among other things, breached a warranty provision contained in the contract. Salt Lake City also claimed that Safeco breached its obligation under the performance bond to either remedy Southwest's breach or indemnify the city for its losses.

Before the court are two motions filed by Salt Lake City. First, the city moves for summary judgment in its favor on its breach of warranty claim against Southwest and its performance bond claim against Safeco. ECF No. 215. Second, the city moves to strike portions of Southwest's and Safeco's responses to the motion for summary judgment. ECF No. 225. The court DENIES the motion for summary judgment and finds the motion to strike to be MOOT.

# BACKGROUND

*A. Southwest Enters into a Contract with Salt Lake City to Rehabilitate a Failing Sewer Line*

In the mid-1960s, Salt Lake City installed the 1800 North sanitary sewer trunk line, which conveys much of the city's wastewater to a water reclamation facility. By 2009, this main sewer line had become severely deteriorated. Large amounts of groundwater infiltrated the sewer line, and it was at risk of catastrophic failure. The city commissioned a geotechnical investigation from RB&G Engineering to determine the feasibility of a project to rehabilitate the sewer line. In October 2009, RB&G issued its final report. RB&G concluded that any rehabilitation project would likely require the contractor to bore two wells in order to pump out groundwater from the project area. The report estimated that each well should be designed to pump water at the rate of one cubic foot per second (cfs).

In late-2009, Salt Lake City advertised for bids to perform a trenchless rehabilitation of the sewer line. Southwest decided to explore the possibility of submitting a bid for the project and attended a November 17, 2009 pre-bid meeting held by the city. At the meeting, Salt Lake City encouraged potential bidders to read the RB&G report. Southwest submitted a bid and on or about January 8, 2010, Salt Lake City awarded the project to Southwest. On January 14, 2010, Southwest obtained a performance bond from Safeco.

The contract between Salt Lake City and Southwest governing the rehabilitation project consists of two main documents that are relevant here: (1) the Project Manual and (2) the 2007 edition of the Manual of Standard Specifications promulgated by the Utah chapter of the American Public Works Association (APWA Manual). The project-specific terms of the contract were contained in the Project Manual, which provided that Southwest would rehabilitate the failing

sewer line by installing a SPR PE liner within the existing pipe. The Project Manuel stated that "[t]he primary contract objective is the structural and hydraulic renewal of the existing sewer." A section of the Project Manual labeled "INSPECTION" provides:

> B. The SPR PE shall be free from visual defects, damage, or deflection. There shall be no visible infiltration through the liner, at the joints, lateral connections, at manhole connections or through manholes.
>
> C. Acceptance of the installed liner shall be based on the video CCTV inspection after grouting to assure all joints are properly assembled, no damage exists, and that no visible leakage or deformation exists as determined by the Engineer. . . .
>
> D. Correction of failed liner deemed defective from post-installation CCTV inspection shall be repaired at no extra cost to [Salt Lake City].

The Project Manual also obliged Southwest to provide "[a] written guarantee of **3-year** minimum shall be provided by the Contractor [Southwest] against any shortcomings in the workmanship." This warranty is known as the "workmanship warranty."

The Project Manual incorporated by reference the terms of the APWA Manual, which provides general terms applicable to a broad scope of public works contracts. The APWA Manual contains an additional warranty: "CONTRACTOR [Southwest] warrants and guarantees to OWNER [Salt Lake City] that all work will be in accordance with the Contract Documents [e.g., the Project Manual] and will not be defective." The APWA Manual goes on to state: "CONTRACTOR's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute." This warranty is known as the "APWA warranty."

  B. *Southwest Attempts to Rehabilitate the Sewer Line.*

After Southwest began work on the project, it discovered that the volume of the groundwater flowing through the project area was much greater than anticipated. Salt Lake City granted two change orders totaling approximately $346,000 in additional funding to pump water

away from the project area. Southwest dug four wells and pumped out over 4.5 cfs of groundwater. But this was still not enough to properly dewater the project area.

In November 2012, Southwest notified Salt Lake City that it had completed the sewer line rehabilitation project. In December 2012, the city advised Southwest that it had discovered "a significant defect and leak in the liner." In August and September of 2013, Southwest attempted to fix this leak but was unsuccessful. In early 2015, Salt Lake City obtained CCTV footage of the interior of the sewer line showing multiple leaks. In June 2015, Southwest sent a letter to Salt Lake City asserting that further attempts to repair the leaks were not feasible until the project area could be adequately dewatered. Southwest further claimed that it had no contractual obligation to conduct further repairs and that if the city provided a design for a project, it would provide an estimate to complete further repairs. Salt Lake City interpreted this letter as a statement that Southwest was abandoning the project.

In June 2016, Salt Lake City hired Water Works Engineers to identify and evaluate alternatives for fixing the leaks in the sewer line. After extensive testing and analysis, Water Works issued its final report in March 2018. Water Works advised that the best alternative for Salt Lake City was to construct a new trunk sewer line along a new alignment. Water Works advised against further attempts to repair the existing sewer line in place because of the expense, the high risk of failure, and the limited useful life of a repaired sewer line. Water Works found that one of the challenges of attempting further repairs of the existing sewer line was the significant groundwater flows in the area. It estimated that repairing the sewer line would require pumping between 22 cfs and 44 cfs of groundwater away from the construction area in order to adequately dewater a potential repair project.

### C. *Salt Lake City Sues Southwest for Breach of Contract*

In November 2017, Salt Lake City sued Southwest and Safeco. It asserted three claims against Southwest: (1) breach of contract, (2) breach of the APWA warranty, and (3) breach of the workmanship warranty. Salt Lake City asserted one claim against Safeco for breach of its obligation under the performance bond to either remedy Southwest's breaches of contract or to indemnify the city for its losses.

Salt Lake City moved for summary judgment on its APWA warranty claim against Southwest and on its performance bond claim against Safeco, arguing that it is entitled to prevail as a matter of law on these claims. Southwest and Safeco filed response briefs to the city's motion for summary judgment. The conclusion section of Southwest's response brief contains the following sentence: "[Southwest] respectfully requests that the Court deny [Salt Lake City's] Motion and in the event the Court concludes sufficient undisputed facts are present that summary judgment be granted in favor of [Southwest] on [Salt Lake City's] warranty claims. See Fed. R. Civ. P. 56(f)(1)."

Salt Lake City subsequently filed a motion to strike what it deemed to be Southwest's untimely motion for summary judgment contained in its response brief. Southwest opposed the motion to strike, arguing that it did not file an untimely motion for summary judgment. It contends that it merely pointed out that under Rule 56(f), the court may sua sponte grant summary judgment for a nonmovant after giving the parties notice and reasonable time to respond.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).

## ANALYSIS

I. **SALT LAKE CITY'S MOTION FOR SUMMARY JUDGMENT ON ITS APWA WARRANTY CLAIM AGAINST SOUTHWEST**

The APWA warranty states that Southwest "warrants and guarantees . . . that all work will be in accordance with the Contract Documents and will not be defective." Southwest further represented that its "obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute." The term "Contract Documents" includes the Project Manual, which states:

> B. The SPR PE shall be free from visual defects, damage, or deflection. There shall be no visible infiltration through the liner, at the joints, lateral connections, at manhole connections or through manholes.
>
> C. Acceptance of the installed liner shall be based on the video CCTV inspection after grouting to assure all joints are properly assembled, no damage exists, and that no visible leakage or deformation exists as determined by the Engineer.

Salt Lake City argues that it is undisputed that Southwest never successfully installed a liner free from visible infiltration, leakage, or deformation. Accordingly, it asserts that it is entitled to summary judgment on its claim that Southwest breached the APWA warranty by failing to complete the work in accordance with the Contract Documents.

Southwest argues that summary judgment in favor of Salt Lake City is inappropriate for a number of reasons. The court addresses two of these arguments below.

    *A. Contract Interpretation*

Southwest first argues that the court should read the APWA warranty out of the contract. It asserts that APWA warranty provision conflicts with the workmanship warranty provision and that the court should construe the workmanship warranty as replacing the APWA warranty.

The court disagrees. Under well-established contract interpretation principals, courts "look for a reading that harmonizes the provisions and avoids rendering any provision meaningless." *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 210 P.3d 263, 269 (Utah 2009). In other words, courts avoid an interpretation that nullifies or renders superfluous any term of a contract. *Id.* Here, there is no reason to nullify the APWA warranty, which guarantees that Southwest's work will conform with the requirements of the contract, because it does not conflict with the workmanship warranty, which guarantees against any shortcomings in Southwest's workmanship for a period of at least three years. The most natural reading of these provisions, and the reading that avoids rendering either provision meaningless, is that Southwest is bound by both the workmanship warranty and the APWA warranty.

This construction conforms with the clause of the contract that governs the interpretation of conflicting provisions. The APWA Manual provides that "[o]nly in case of irreconcilable conflict between provisions within the Contract Document or between Contract Documents, the intent of the Contract Documents shall be interpreted" in accord with a list of priorities. APWA Manual § 3.2(C)(4). The condition precedent to applying the enumerated list of priorities is an irreconcilable conflict between contract provisions. But, as noted above, there is no conflict between the workmanship warranty and the APWA warranty, much less an irreconcilable conflict.

Southwest argues that another provision of the APWA Manual requires a reading that negates the APWA warranty. It points to § 3.2(B) of the APWA Manual, which provides: "No

7

provision of any referenced manual or code . . . shall be effective to change the duties and responsibilities of [Southwest] . . . from those set forth in the Contract Documents . . . ." Thus, no provision of the APWA Manual can modify the duties outlined in the Project Manual, including the workmanship warranty. But the APWA warranty provision does not alter the workmanship warranty in any way. Southwest's duty to provide a workmanship warranty remains unchanged. The contract, read as a whole, merely provides for two independent warranties: the workmanship warranty and the APWA warranty.

In short, the court rejects Southwest's argument that the APWA warranty should be interpreted as a nullity.

### B. Parson Construction *Affirmative Defense*

Next, Southwest argues that the court should deny Salt Lake City's motion for summary judgment because the city provided inaccurate information related to the project. Southwest pled an affirmative defense for "differing cite conditions" and for the "implied warranty of the plans and specifications." ECF No. 81 at 24. In its opposition to Salt Lake City's motion for summary judgment, Southwest argues that the court should not grant summary judgment in favor of Salt Lake City because "changed conditions" and the "implied warranty of specifications" are defenses to liability. Southwest asserts that under these doctrines it should not be liable for breach of the APWA warranty because it reasonably relied on the RB&G report's representation that groundwater flows in the project area were around 2 cfs. Southwest contends that this representation was wrong. It cites evidence that the groundwater flows were actually between 22

and 44 cfs. Southwest argues that the excess groundwater constitutes a changed condition that excuses any breach of the APWA warranty.[1]

    1) *Parson Construction*

Regardless of whether Southwest applies the label "changed conditions" or "implied warranty of specifications" to its argument, it is clear that it relies upon the concepts articulated in *Jack B. Parson Construction Co. v. Utah Department of Transportation*, 725 P.2d 614 (Utah 1986) and related cases to support its contention that it should not be held liable for any breach of the APWA warranty. In that case, a contractor bid for a project to pave a section of highway. *Id.* at 615. The Utah Department of Transportation (UDOT) provided a number of documents labeled "Plans" to potential bidders. These documents included a map of the project area and a sheet containing bore hole test results from borrow pits near the construction area. These documents indicated that the material contained in the borrow pits would be suitable for use in the paving project, and the contractor relied upon these documents in preparing its bid. *Id.* The contractor was awarded the contract to pave the highway. But when the contractor crushed rocks found in the borrow pits for use in the paving project, the parties discovered that the material was not suitable for paving the highway and that the asphalt produced from the material did not meet contract specifications. *Id.* The contractor stopped work on the project and insisted on changes to the contract to account for

---

[1] Southwest also asserted that although drawings provided by Salt Lake City depicted a relatively gradual decline in one segment of the sewer line, the angle of the drop was much steeper in reality. Southwest argued that this drop in the sewer line was a changed condition that would preclude summary judgment in favor of Salt Lake City. But Southwest failed to cite record evidence indicating that the angle of drop in the sewer line differed in any material respect from that indicated in the drawings provided by Salt Lake City. Because Southwest failed to support its argument regarding the angle of the drop with record evidence, the court confines its analysis to the alleged groundwater changed condition.

9

the fact that the material found in the borrow pits could not be used to complete the project. UDOT declined to modify the contract and ordered the contractor to perform the paving project in accord with the terms of the existing contract. When the contractor refused, UDOT terminated the contract pursuant to its terms. *Id.* at 615–16.

The contractor sued UDOT, seeking a declaratory judgment interpreting the contract and damages for breach of the contract and/or intentional misrepresentation. *Id.* at 616. After a bench trial, the district court rejected the contractor's claims and ruled that the contractor, not UDOT, had breached the contract. *Id.* The Utah Supreme Court reversed, holding that "[a] contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover [damages] in a contract action." *Id.* (second alteration in original). In so holding, the court rejected the district court's narrow interpretation of "plans and specifications" to exclude the bore test results because the document did not meet the technical definition of "plans" set forth in the contract. *Id.* Because the test results were provided by UDOT as foundational material for preparing the bid and for entering into the construction contract, the document "was something upon which the bidder was entitled to rely and which must be scrutinized for accuracy." *Id.* The court further concluded that the bore test results and another bid document were misleading and remanded the case to the district court to determine whether the contractor's reliance on the representations made in these documents was reasonable. *Id.* at 617–18.

Other cases from Utah and elsewhere confirm that a contractor is entitled to compensation for damages caused by misrepresentations that the contractor reasonably relies upon for submitting a bid and entering into a construction contract. *Thorn Const. Co. v. Utah Dep't of Transp.*, 598 P.2d

10

365, 370 (Utah 1979) (contractor was entitled to damages for extra transportation costs where it relied upon an inaccurate representation that borrow material near the construction site would be suitable for use in the project); *Hollerbach v. United States*, 233 U.S. 165, 172 (1914) (cited in *Thorn Construction*) (contractor was entitled to damages for extra costs where it relied upon an inaccurate specifications regarding the character of material conditions related to a dam repair project); *Souza & McCue Const. Co. v. Superior Ct.*, 370 P.2d 338, 340 (Cal. 1962) (cited in *Parson Construction*) ("[F]urnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness.").

  Although most of the cases applying the principal articulated in *Parson Construction* involve a contractor seeking damages for increased construction costs, *see, e.g.*, *Thorn Const.*, 598 P.2d at 367, the court concludes that this legal concept is broad enough to be applied as an affirmative defense to a breach of contract claim. Indeed, *Parson Construction* suggests that a misleading representation claim can be a defense to liability. In that case, the contractor indisputably breached the construction contract by refusing to complete the project under the terms of the existing agreement. Thus, by holding that the contractor was entitled to an opportunity to prove its claims for declaratory judgment and for damages, the Utah Supreme Court implied that the contractor's breach of the contract could be excused if it could prove its claim that it reasonably relied on inaccurate representations in the bid documents when it entered the construction contract. Moreover, similar legal principals have been applied as affirmative defenses to contract claims. *See Fisher v. Davidhizar*, 491 P.3d 110, 118 (Utah Ct. App. 2021) (defendant prevailed on fraudulent inducement affirmative defense to breach of contract claim); *ACC Cap. Corp. v. Ace W. Foam Inc.*, 420 P.3d 44, 49 (Utah Ct. App. 2018) (recognizing fraud as a defense to breach of contract); *KTM Health Care Inc. v. SG Nursing Home LLC*, 436 P.3d 151, 158 (Utah Ct. App.

2018) (applying mutual mistake as an affirmative defense to breach of contract); *Stake Ctr. Locating, Inc. v. Logix Commc'ns, L.P.*, No. 2:13-CV-1090 TS, 2015 WL 3792602, at *6 (D. Utah June 18, 2015) (same).

Accordingly, *Parson Construction* can be applied as an affirmative defense. The question presented here is whether Salt Lake City has shown that it is entitled to summary judgment on this defense.

2) Application of *Parson Construction* to this case

Salt Lake City argues that Southwest's *Parson Construction* defense fails as a matter of law for a number of reasons. But the court determines that disputes of material fact preclude summary judgment on this issue.

Salt Lake City first argues that any reliance on the RB&G report's recommendation that two 1-cfs pumps be used to dewater the project area was not reasonable because it informed Southwest at the pre-bid meeting to expect as much as 25,900,000 gallons-per-day (about 40 cfs) of groundwater infiltrating the sewer line at and upstream of the project area. Salt Lake City, however, has not properly cited record evidence to support this contention. Salt Lake City cites the declaration of Derek Velarde to support its claim that it informed potential bidders of large amounts of water infiltrating the sewer line. The Velarde declaration, in turn, cites a nonexistent page of exhibit 1.A to the city's motion for summary judgment. Because the court cannot locate the record evidence supporting Salt Lake City's claimed disclosure, the court may not consider it. *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). Moreover, even if the city had properly cited evidence supporting the sewer line infiltration disclosure, it would not be entitled to summary judgment because disputes of material fact would remain as to whether

Southwest reasonably relied on the groundwater estimate found in the RB&G report despite the alleged disclosure. Indeed, the jury could conclude that it was reasonable to rely on the RB&G report estimate because it specifically addressed the groundwater in the project area, while the infiltration estimate dealt with the total amount of water entering the sewer line along its entire length.

Salt Lake City also argues that Southwest has not produced evidence that it relied on the RB&G report when it entered into a contract to complete the sewer line rehabilitation project. But the city raised this argument for the first time in its reply brief, depriving Southwest of an opportunity to cite evidence of reliance. Moreover, there is circumstantial evidence of reliance in the record. At the pre-bid meeting, Salt Lake City's chief engineer encouraged potential bidders to read the RB&G report. Both the chief engineer and the project engineer for Salt Lake City testified that they expected potential bidders to review the RB&G report and to use it to prepare bids for the project. The president of Southwest, Justin Duchaineau, also provided a declaration stating that the company routinely relies on geotechnical reports, like the RB&G report, when preparing bids for a project.[2] This indirect evidence of reliance is sufficient to create a dispute of material fact on this issue.

---

[2] As noted below in Part I.C of this order, Salt Lake City objects to portions of the Duchaineau declaration, including his statement that Southwest relied upon the RB&G report to prepare its bid, on the grounds that he lacks personal knowledge regarding the bidding process because he did not become president of the company until roughly three years after Southwest bid for the sewer rehabilitation project. But Salt Lake City's personal knowledge objection does not apply to Duchaineau's statements regarding Southwest's general practices and procedures.

Next, Salt Lake City argues that section 4.2(A) of the APWA Manual contractually barred Southwest from relying on the groundwater estimate found in the RB&G report. This clause provides:

> Reference, when applicable, is made to geotechnical data in the Bid Documents for identification of those reports of explorations and tests of subsurface conditions at the site that have been utilized by ENGINEER in preparation of the Contract Documents. CONTRACTOR may rely on the accuracy of the technical data contained *in such reports* at the locations and the indicated depths where the data was obtained, but not upon the other information, interpretations or opinions contained therein or for the completeness thereof, expressed or implied.

(Emphasis added). Salt Lake City argues that this section precluded Southwest from relying on the RB&G report's recommendation that two 1-cfs pumps be used to dewater the project area because this portion of the report constituted an opinion rather than geotechnical data. But section 4.2(A) of the APWA Manual does not apply to the RB&G report. The first sentence of this provision states that the Bid Documents may reference reports that the engineer used to prepare the Contract Documents. The second sentence states that a contractor may rely on technical data contained "in such reports," but not on opinions contained therein. Thus, the application of section 4.2(A) is expressly limited to reports attached to or referenced in the Bid Documents. The Bid Documents in this case, however, do not reference any geotechnical reports. Section 1.5(B) of the Instructions to Bidders document states: "Provisions concerning surface and subsurface conditions, *if any*, are set forth in the Geotechnical Data (Document 00 31 32). The document provides the identification of . . . those reports of explorations and tests of subsurface conditions at the site which have been utilized by ENGINEER in preparing the Contract Documents . . . ." (Emphasis added). But in the Bid Documents provided to the court, there is no Document 00 31 32, nor any Geotechnical Data

14

document. Because the RB&G report was not referenced in the Bid Documents, section 4.2(A) of the APWA Manual simply does not apply to this report.

Salt Lake City also argues that section 4.2(C) of the APWA manual precludes Southwest from asserting that inaccurate representations regarding site conditions should excuse any breaches of the APWA warranty. The court disagrees. This section states that the contractor must promptly notify the city of any site conditions that differ materially from conditions described in the Contract Documents. It then goes on to state: "Failure by the CONTRACTOR to give notice about the inaccuracy or difference, and the performance of any work in connection with said differing site conditions . . ., shall bar the CONTRACTOR from making any claim for additional compensation in connection therewith." Thus, the penalty for failing to provide prompt notice of differing site conditions is the forfeiture of any claim to additional compensation. But the issue here is not additional compensation. Southwest seeks to avoid its contractual duties under the APWA warranty. Accordingly, section 4.2(C) is not relevant to its *Parson Construction* defense.

In short, the court rejects Salt Lake City's arguments for summary judgment in its favor. Southwest has produced sufficient evidence to create a dispute of material fact as to its *Parson Construction* affirmative defense to the breach of the APWA warranty claim. As noted above, Salt Lake City provided a document to Southwest that arguably misrepresented the volume of the groundwater flow in the project area. The city has not shown that, as a matter of law, it was unreasonable for Southwest to rely on these representations when it submitted its bid and entered into the construction contract containing the APWA warranty. Because Salt Lake City has failed to show that this affirmative defense fails as a matter of law, it is not entitled to summary judgment on its APWA warranty claim.

### C. Objections to Declarations

Salt Lake City objects to two declarations that Southwest submitted to the court. *See* ECF No. 234. It argues that the court should not consider portions of a declaration provided by Southwest's president, Justin Duchaineau, because he did not have personal knowledge of the bidding process. Salt Lake City also objects to portions of the declaration provided by Southwest's expert, John O'Donnell, because it asserts that the declaration does not comply with Rule 702 of the Federal Rules of Evidence.

Southwest also objects to a declaration provided by Salt Lake City. *See* ECF No. 244. It argues that the declaration of Derek Velarde should be excluded because he lacks relevant personal knowledge and because portions of his declaration do not comply with Rule 702.

The court, however, did not rely on the portions of these declarations that were challenged in resolving Salt Lake City's motion for summary judgment. Accordingly, these objections are moot.

## II. SALT LAKE CITY'S MOTION FOR SUMMARY JUDGMENT ON ITS PERFORMANCE BOND CLAIM AGAINST SAFECO

Salt Lake City also moves for summary judgment on its claim that Safeco breached its obligations under the performance bond to either remedy Southwest's breach of the APWA warranty or to indemnify the city for its losses. Salt Lake City's motion for summary judgment against Safeco is premised on its assertion that it should prevail as a matter of law on its APWA warranty claim against Southwest, which would trigger Safeco's obligations under the performance bond. But, as explained above, the court denies summary judgment in the city's favor. Because Salt Lake City has not established Southwest's liability for breach of the warranty, it cannot prevail on its motion for summary judgment against Safeco. *See Painters Loc. Union No.*

*171 Int'l Bhd. of Painters & Allied Trades, AFL-CIO v. Williams & Kelly, Inc.*, 605 F.2d 535, 539 (10th Cir. 1979) ("In the absence of special provisions in the contract, the liability of a surety on a performance bond is coextensive with that of its principal."). Accordingly, the court denies Salt Lake City's motion for summary judgment against Safeco.

### III. SALT LAKE CITY'S MOTION TO STRIKE

Salt Lake City moves to strike a sentence contained in Southwest's response brief in which it suggests that the court, on its own initiative, may consider granting summary judgment in its favor under Rule 56(f). The city argues that this sentence amounts to an untimely motion for summary judgment. But the court is not inclined to invoke its power under Rule 56(f) to grant summary judgment to a nonmovant. Therefore, Salt Lake City's motion to strike is moot.

### CONCLUSION AND ORDER

The court orders as follows:

(1) The court DENIES Salt Lake City's motion for summary judgment. ECF No. 215.

(2) The court finds Salt Lake City's motion to strike to be MOOT. ECF No. 225.

DATED August 3, 2022.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge